**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JULIE S.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 21 C 4816** |
| **v.** | ) | |
| | ) | **Magistrate Judge Finnegan** |
| **MARTIN J. O'MALLEY, Acting** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Julie S. seeks to overturn the final decision of the Acting Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.  The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed or the case remanded.  The Commissioner responded with a competing motion for summary judgment in support of affirming the ALJ's decision.  After careful review of the record and the parties' respective arguments, the Court affirms the ALJ's decision.

## BACKGROUND

Plaintiff applied for SSI on November 28, 2018, alleging disability since March 1, 2017 due to depression.  (R. 149-55, 164-68).  She later amended the alleged onset date to the date of her application, November 28, 2018.  (R. 15, 257).  Born in 1968, Plaintiff

---

[1]    Martin J. O'Malley became the Acting Commissioner of Social Security on December 20, 2023.  He is automatically substituted as the named defendant pursuant to FED. R. CIV. P. 25(d).

was 50 years old as of the application and amended disability onset date, making her a person closely approaching advanced age (age 50-54).  (R. 24, 57); 20 C.F.R. § 416.963(d).  Plaintiff was born in Iraq and came to the United States with her husband and six children in 2009.  (R. 60, 196, 361, 454).  She lives in a house with her husband and at least one of her sons, and she appears to have a 6th grade education (though she indicated a 12th grade education in her disability report).  (R. 21-22, 24, 67, 150, 169, 207, 257-59, 361, 454).  She has never worked in the United States, and thus has no past relevant work, nor has she engaged in any substantial gainful activity since the application date.  (R. 18, 67, 82, 189-96, 361, 366, 454).

The Social Security Administration denied Plaintiff's application initially on March 14, 2019, and again upon reconsideration on September 10, 2019.  (R. 57-99).  Plaintiff filed a timely request for a hearing and appeared before administrative law judge Lana Johnson (the "ALJ") on September 28, 2020.[2]  (R. 31, 100).  The ALJ heard testimony from Plaintiff, who was represented by counsel, and from vocational expert Michelle Peters Pagella (the "VE").  (R. 33-56).  On February 2, 2021, the ALJ found that Plaintiff has severe mental impairments in the form of major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder ("PTSD"), as well as several non-severe physical impairments, but that they do not alone or in combination meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 18, 26).

---

[2]     The hearing was held telephonically due to the COVID-19 pandemic.  Although Plaintiff "speaks some English," an Arabic interpreter assisted due to her "very shaky and inconsistent" level of understanding.  (R. 15, 33-35, 256-57, 262).

After reviewing the medical and testimonial evidence, the ALJ concluded that Plaintiff has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following non-exertional limitations: Plaintiff can understand, remember, and carry out simple, routine, and repetitive instructions; she cannot meet fast, hourly production goals but can meet end-of-day goals; she can use judgment limited to simple work-related decisions; she can tolerate occasional interaction with supervisors and co-workers but cannot perform tandem and coordinated tasks with co-workers; and she can tolerate brief and superficial interaction with the general public. (R. 20). The ALJ accepted the VE's testimony that a person with Plaintiff's background and this RFC could perform jobs that exist in significant numbers in the national economy, such as a cleaner, laundry worker, or inspector. (R. 24-25, 48-51). The ALJ thus found Plaintiff not disabled at any time since her November 28, 2018 application. (R. 25). The Appeals Council denied Plaintiff's request for review on July 14, 2021 (R. 1-6), leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by this Court under 42 U.S.C. § 405(g). *See Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009); *Payne v. Colvin*, 216 F. Supp. 3d 876, 880 (N.D. Ill. 2016).

In support of her request for reversal or remand, Plaintiff argues that the ALJ: (1) erred in finding that her mental impairments do not meet or equal a listing; (2) failed to properly account for her limitations in concentration, persistence, and pace ("CPP") in the RFC determination; and (3) erroneously concluded that she has no exertional limitations. As discussed below, this Court finds that the ALJ did not commit reversible error and her decision is supported by substantial evidence.

**DISCUSSION**

**A.     Standard of Review**

Judicial review of the Commissioner's final decision is authorized by the Social Security Act. 42 U.S.C. §§ 405(g), 1383(c)(3).  In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security regulations.  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'"  *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007); *see also L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1151-52 (7th Cir. 2019).  The Court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

In making its determination, the Court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled."  *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).  The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'"  *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)) (internal citations and quotation marks omitted)).  When the ALJ's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."  *Hopgood ex*

*rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

**B.      Five-Step Inquiry**

To recover SSI, a claimant must establish that she is disabled within the meaning of the Social Security Act.  *Shewmake v. Colvin*, No. 15 C 6734, 2016 WL 6948380, at *1 (N.D. Ill. Nov. 28, 2016).  A claimant is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).   In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves considering whether: "(1) the claimant is presently employed; (2) the claimant has a severe impairment or a combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves [her] unable to perform [her] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy."  *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021); *see also Melvin J. v. Kijakazi*, No. 20 C 3284, 2022 WL 2952819, at *2 (N.D. Ill. July 26, 2022) (citing 20 C.F.R. § 416.920(a)).  If the claimant meets her burden of proof at steps one through four, the burden shifts to the Commissioner at step five.  *Butler*, 4 F.4th at 501.

C.    **Analysis**

1.    **The Listings**

Plaintiff first argues that the case must be reversed or remanded because the ALJ erred in finding that her mental impairments did not meet or medically equal any listing. (Doc. 15, at 9-13).  The ALJ determined that Plaintiff's mental impairments did not meet or equal listings 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.15 (trauma-and-stressor-related disorders).  (R. 18-20); *see* 20 C.F.R. pt. 404, subpt. P, App. 1 §§ 12.04, 12.06, 12.15.  These listings consist of three sets of criteria, referred to as the "paragraph A" criteria, "paragraph B" criteria, and "paragraph C" criteria.  *Sheralyn B. v. Kijakazi*, No. 22 C 50280, 2023 WL 6290588, at *2 (N.D. Ill. Sep. 27, 2023).  To meet or equal one of the listings and thus be found *per se* disabled, a claimant must satisfy the listing requirements of paragraph A, "which is the specific type of disorder," and either paragraph B or C, "which addresses the impact of the disorder on the claimant."  *Danielle S. v. Kijakazi*, No. 20 C 50338, 2023 WL 8190726, at *2 (N.D. Ill. Nov. 27, 2023).

Plaintiff focuses here on paragraph B, which is met if a claimant has an "extreme" limitation in one of four areas of mental functioning or a "marked" limitation in two of the areas.  *Id.*  These functional areas are: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.  *Sheralyn B.*, 2023 WL 6290588, at *2 n.3; *Danielle S.*, 2023 WL 8190726, at *2 (citing 20 C.F.R. § 404, Subpart P, App. 1 §§ 12.04(B), 12.06(B), 12.15(B)).  A claimant has the "burden to show not only that her impairments meet a listing, but that her impairments satisfy all of the various criteria specified in the

6

listing." *Ann S. v. Saul*, No. 19 C 1661, 2021 WL 354001, at \*4 (N.D. Ill. Feb. 2, 2021) (citation omitted); *Jiri K. v. Kijakazi*, No. 20 C 7621, 2022 WL 2704058, at \*2 (N.D. Ill. July 12, 2022) (citing *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006)).

The ALJ found that Plaintiff did not satisfy the paragraph B criteria and, in turn, did not meet a listing because she had only moderate limitations in interacting with others and CPP and only mild limitations in adapting or managing herself and understanding, remembering, or applying information. (R. 19-20). In finding that Plaintiff had a moderate limitation in interacting with others, the ALJ noted that while Plaintiff alleged to experience anxiousness and panic attacks, as well as a lack of desire to be around other people (R. 19), Plaintiff nonetheless: had coffee with her friend Marlin Toma twice per week at her home (R. 177, 181); made good eye contact and was "cooperative" at a February 27, 2019 mental status examination with Licensed Clinical Psychologist William J. Hansen, Ph.D. (R. 360-63); had appropriate behavior and was again "cooperative" at an August 6, 2019 consultative examination with Jauren D. Kelly, Psy.D.[3] (R. 454-57); appeared to have a normal mood and either normal or pleasant affect during physical examinations in May 2019, July 2019, September 2019, February 2020, and April 2020 despite exhibiting a sad, depressed mood and constricted affect during the consultative examinations (*see, e.g.*, R. 460, 464-65, 469, 533); was found to be "pleasant" at a physical therapy session in December 2019 (R. 637, 645); and gave no indication to her treating providers that she

---

[3] The record contains two doctors with the last name Kelly: (1) Dr. Jauren Kelly, a consultative psychologist who conducted a mental status examination of Plaintiff on August 6, 2019 (R. 454-57); and (2) Dr. Jeannette S. Kelly, who treated Plaintiff at Weiss Hospital's Center for Orthopedics. (R. 459-73). To avoid confusion, the Court refers to the first and last name of each doctor.

"ha[d] any particular difficulty getting along with others in the treatment setting (either with staff or other clients)." (R. 19).

As to CPP, in finding a moderate limitation, the ALJ noted that at the August 2019 consultative examination Plaintiff seemed to have a poor fund of information, as well as limited insight and impaired judgment. (R. 19, 456). At the February 2019 consultative examination, however, Plaintiff: appeared well oriented to person, time, and place; was able to subtract 7 from 100 and add single digits; showed intact judgment, insight, and immediate memory; was well able to describe how things were similar and different; and gave no indication that she was confused. (R. 19, 362). Finally, the ALJ determined that Plaintiff's ability to adapt or manage herself was only mildly limited, because, although she reported some problems when facing stressors and limitations on her ability to cope in her December 5, 2018 Function Report (R. 19, 269-76), she also stated that she was able to: independently groom and perform self-care; clean dishes; drive a car, and help get her son ready for school. (R. 19-20, 270, 272-73). She was also neatly groomed at the August 2019 consultative examination. (R. 20, 456).[4]

Plaintiff contends that the ALJ erred in reaching these conclusions because her analysis was "not based on a full and fair review of the evidence of record" and the ALJ instead should have found at least marked limitations in all three areas. (Doc. 15, at 10-13; Doc. 22, at 7-9). The Court disagrees.

---

[4]     In her opening brief, Plaintiff does not challenge the ALJ's determination that she had only a mild limitation in her ability to understand, remember, or apply information. In her reply brief, however, Plaintiff spends over three pages arguing that the ALJ's analysis of this area was also flawed. (Doc. 22, at 3-7). Plaintiff has waived the argument, as "[i]t is well established that arguments are waived if not raised in the opening brief." *Malgorzata K. v. Kijakazi*, No. 20 C 296, 2022 WL 2257122, at *2 (N.D. Ill. June 23, 2022) (citing cases); *Martin v. Kijakazi*, No. 21-1920, 2022 WL 1681656, at *3 (7th Cir. 2022) (arguments first raised in reply are waived). The Court's analysis, therefore, focuses only on the three other paragraph B domains.

To begin, the only opinions of record came from the state agency psychological consultants, who both found that Plaintiff did not meet a listing. At the initial level of review, on March 8, 2019, Keith Burton, Ph.D. concluded after reviewing Plaintiff's medical records that her mental impairments did not meet or medically equal listing 12.04. (R. 62-63). Approximately five months later, on August 19, 2019, David Voss, Ph.D. reached the same conclusion and also determined that Plaintiff did not meet listing 12.15. (R. 77-78).[5] The ALJ found these physicians' opinions persuasive and Plaintiff does not point to any physician who reached a contrary conclusion. *See Filius v. Astrue*, 694 F.3d 863, 867 (7th Cir. 2012) ("[Claimant] urges that his medical records compel a finding that he has the equivalent of [a listing]. But he disregards the opinions from two state-agency physicians who concluded that he did not meet or medically equal any listed impairment. Because no other physician contradicted these two opinions, the ALJ did not err in accepting them."); *see also Jiri K.*, 2022 WL 2704058, at *5 (ALJ's determination that claimant's learning disorder did not meet or equal a listing was supported by substantial evidence where the state agency reviewing psychologists concluded the condition did not meet or equal a listing and claimant pointed to no contradictory opinion); *Paul B. v. Kijakazi*, No. 20 C 2250, 2022 WL 475188, at *2 (C.D. Ill. Jan. 3, 2022) (ALJ was "entitled to rely on the opinions of the State agency medical experts" finding that claimant did not meet listings 12.04 and 12.06 where claimant neither "produce[d] any expert opinion stating that he met the criteria of any *per se* listing" nor "provide[d] an opinion of greater limitations").

---

[5]     The paragraph B criteria are the same for listings 12.04, 12.06, and 12.15. *Sheralyn V.*, 2023 WL 6290588, at *2 n.3.

Furthermore, Dr. Burton's and Dr. Voss's opinions support the ALJ's finding of no-more-than-moderate limitations in the paragraph B domains that Plaintiff challenges. Dr. Burton found that Plaintiff had moderate limitations in only one of the paragraph B domains—CPP—and mild limitations in interacting with others and adapting or managing herself. (R. 62-63). In a Mental Residual Functional Capacity Assessment ("MRFC"), Dr. Burton explained that Plaintiff's "mood disorder, which was established in 8/18 and has not been the focus of extensive medical care or hospitalizations, would at most moderately limit her ability to sustain the concentration, persistence and pace required for competitive work." (R. 64-65). Additionally, regarding Plaintiff's mild limitations in social interaction and adaptation, Dr. Burton explained that: (1) Plaintiff's "social skills are intact, but her mood symptoms would limit her to working most effectively with coworkers and employers rather than the general public"; and (2) although Plaintiff "does not have a documented history of significant decompensation when facing stressors, her recent mood symptoms have likely imposed some mild limits on her ability to cope." (R. 66). Dr. Voss affirmed this assessment. (R. 77-81).

In her reply, Plaintiff suggests that the ALJ erred in relying on the state agency reviewing psychologists' opinions regarding listing level equality or equivalence because they "did not have the opportunity to review all of the medical evidence." (Doc. 22, at 1-2). To prevail on this argument, Plaintiff must demonstrate that the record reveals "later evidence containing new, significant medical diagnoses [that] reasonably could have changed the [state agency psychologists'] opinion[s]." *Sofia W. v. Kijakazi*, No. 21 C 50461, 2023 WL 2333303, at *8 (N.D. Ill. Mar. 2, 2023) (quoting *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018)); *see also Kemplen v. Saul*, 844 F. App'x 883, 887 (7th Cir.

2021) (internal quotations and citations omitted) (explaining that "not all new evidence will necessitate a remand . . . [and t]he issue, then, comes down to whether the new information changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment by a non-examining physician and by evaluating himself the significance of the subsequent report, or whether the updated information was minor enough that the ALJ did not need to seek a second opinion").

Plaintiff identifies two records post-dating the psychologists' opinions that she appears to believe meet this standard. One is a September 10, 2020 letter from a case manager at the "Mental Health Department" of Asian Human Services, Inc. ("AHS"), noting that Plaintiff had been referred for psychiatry and therapy services, had undergone a mental health assessment on August 14, 2020, was receiving counseling and case management services at AHS, and was suffering from depression and anxiety that were "getting worse day by day." (R. 458). While the AHS letter generally states that Plaintiff's depression and anxiety were worsening by the day and therefore required "special treatment timely" (*id.*), there is no indication that this letter introduces a new, significant diagnosis or information that "changed the picture." *Kemplen*, 844 F. App'x at 887. According to Plaintiff, "her mental illness began years ago in Iraq." (R. 22, 455). Plaintiff's family medicine physician, Najat George, M.D., appears to have first diagnosed her with depression in January 2018 (R. 325), but his treatment notes make no further mention of it until August 2018, when he assessed both major depression and anxiety. (R. 317-18). At an October 31, 2018 appointment, Dr. George noted that Plaintiff had no mental concerns and made no other mention of her mental conditions. (R. 315).

Roughly four months later, Dr. Hansen noted at the February 27, 2019 consultative examination that Plaintiff appeared sad and tired looking, seemed to have a somber, sad, and depressed mood and constricted affect, and "describe[d] a constellation of symptoms consistent with depression and anxiety." (R. 360, 362-63). He diagnosed her with depression. (R. 363). On May 8, 2019, Dr. George assessed major depression and prescribed Celexa, though Plaintiff reported having no mental complaints at that visit or during another one the following week. (R. 381-82). Later that month, Plaintiff reported symptoms of depression and sleep issues to Dr. Jeannette Kelly at a May 28, 2019 appointment. (R. 549).

Plaintiff's "worsening" depression and anxiety appears to have surfaced around June 8, 2019, when Plaintiff complained to Dr. George that she'd been experiencing worsening depression and anxiety symptoms for a few weeks, and he referred her for psychiatry services. (R. 21-22, 380). The following month, Plaintiff denied any psychiatric symptoms at an appointment with Dr. Jeannette Kelly on July 30, 2019. (R. 551). At the August 6, 2019 consultative examination, Dr. Jauren Kelly found that Plaintiff had a depressed mood and affect with symptoms including intrusive thoughts and flashbacks of past trauma, crying episodes, and isolative behavior. She diagnosed Plaintiff with severe, recurrent major depression and PTSD and noted that Plaintiff was taking Citalopram and Lorazepam, which Dr. George had started prescribing over a year earlier. (R. 454-57). Two days later, on August 8, 2019, Plaintiff complained of chronic fatigue but had no mental complaints at an appointment with Dr. George. (R. 505). He assessed chronic fatigue and major depression and ordered Plaintiff to continue Citalopram. (*Id.*).

12

Shortly thereafter, on August 19, 2019, Dr. Voss reviewed Plaintiff's medical records at the reconsideration level. Dr. Voss noted that Dr. George's June 8, 2019 treatment records "indicate[d] worsening depression and anxiety" but ultimately determined that Plaintiff had only mild and moderate limitations in mental functioning. (R. 77). Thereafter, Plaintiff denied any psychiatric symptoms or mental complaints at appointments with Drs. Jeannette Kelly and George on September 3, 2019 and January 30, 2020. (R. 463, 498).

In sum, Plaintiff has not shown how the September 2020 letter from the AHS case manager, which generally alludes to worsening anxiety and depression, constitutes a new, significant diagnosis that differs from the depression and anxiety reflected throughout Plaintiff's treatment records and that was considered by the agency psychologists. Nor does Plaintiff acknowledge the fact that the ALJ considered the AHS letter and ultimately found her to be more limited in mental functioning than the agency psychologists or any other physician of record. (R. 19, 21, 23-24) (finding moderate as opposed to mild limitations in interacting with others). Notably, while the letter indicates that the AHS case manager was helping to link Plaintiff to psychiatric services at an outside clinic (R. 21, 458), the record does not contain any psychiatry or other mental health treatment records either before or after the letter.[6] Other than the AHS letter itself,

---

[6]     In a footnote, Plaintiff notes that she had "difficulty finding a psychiatrist who [would] take her limited insurance" and claims that, in light of this fact, "Defendant's argument that the ALJ could properly diminish the severity of [her] mental impairments because no treating psychiatrist provided a report regarding severity is, at best, disingenuous." (Doc. 22, at 2 n.1). But the ALJ acknowledged Plaintiff's purported difficulties securing a psychiatrist due to insurance, including: (1) Plaintiff's testimony that she believed there were "insurance problems in finding someone who [would] accept her insurance"; and (2) Plaintiff's report to Dr. Jauren Kelly during the August 2019 consultative examination that she had not yet seen a psychiatrist due to insurance issues. (R. 21-23). This does not change the fact that none of the physicians of record, including Plaintiff's treating physicians Drs. George and Jeannette Kelly, opined that she has greater limitations in the paragraph B areas than determined by the ALJ or determined that she met or equaled a listing.

there are no records related to the counseling and case management services Plaintiff received at AHS, including the August 14, 2020 mental health assessment that was mentioned in the letter or any subsequent treatment.  (R. 21).

The second record Plaintiff relies on as evidence that the state agency psychologists' opinions are stale is an October 23, 2019 form, in which David E. Nissan, M.D., an otolaryngologist, noted that Dr. George had referred Plaintiff to him for an earache and assessed right-ear hearing loss and an earache "due to TMJ pain due to anxiety/depression."  (R. 540).  Aside from stating that "[t]he agency reviewers did not see Dr. Nissan's report" (Doc. 22, at 2), however, Plaintiff offers no explanation as to how this note from an otolaryngologist introduces a new, significant diagnosis that changed the landscape so much that it would have led the agency psychologists to reach different conclusions regarding Plaintiff's mental functioning.  Plaintiff's conclusory observation in her opening brief that "Dr. Nissan noted anxiety and depression" (Doc. 15, at 5) is insufficient.

Plaintiff also argues that the ALJ could not properly rely on the agency psychologists' findings in reaching her paragraph B determinations because the ALJ did not refer to those opinions within her step three analysis and only discussed them within the RFC analysis four pages later.  (Doc. 22, at 2-3).  But as the Seventh Circuit has noted, "[t]he five-step evaluation process comprises sequential determinations that can involve overlapping reasoning.  This is certainly true of step three and the RFC determination that takes place between steps three and four . . . ."  *Jeske v. Saul*, 955 F.3d 583, 590 (7th Cir. 2020) (internal citation omitted); *see also Zellweger v. Saul*, 984 F.3d 1251, 1254 (7th Cir. 2021) (citation omitted) (nothing prohibits the court from

14

reviewing the ALJ's step-three determination "in light of elaboration and analysis appearing elsewhere in the decision"); *Ann S.*, 2021 WL 354001, at *6 (rejecting claimant's contention that the court should consider the ALJ's listing level analysis "only within the four corners of the section of her decision specifically demarcated for step three," as courts "do[] not consider the ALJ's step three discussion in a vacuum"); *Lisa S. v. Saul*, No. 19 C 862, 2020 WL 5297028, at *7 (N.D. Ill. Sep. 4, 2020) (quoting *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004)) (ALJ's consideration of state agency experts' reports outside of her step-three discussion did not require remand because "'it is proper to read the ALJ's decision as a whole' instead of in discrete parts"). Thus, the Court is unpersuaded by either of Plaintiff's arguments challenging the ALJ's reliance on the agency psychologists' opinions in reaching her paragraph B determinations and concluding that Plaintiff did not meet a listing.

Nor does Plaintiff identify any medical records beyond her own subjective statements that support additional limitations in her mental functioning. Regarding the ALJ's finding that she has a moderate limitation in her ability to interact with others, Plaintiff contends that the ALJ "downplay[ed] [her] isolative behavior and her consistent reports of wanting to be alone and not talk to other people." (Doc. 15, at 11). For support she points to: her own statements in a June 11, 2019 Function Report regarding anxiety and panic attacks she experiences when she has to be around other people and her desire to be alone (R. 207, 210-13); her own statement in an April 30, 2019 Disability Report that she "do[es] not want to talk to anyone" (R. 200) and statement in an October 30, 2019 Disability Report that she "[w]ants to be left alone [and] [d]oesn't want to speak [to] or see anyone" (R. 231); her reporting to Dr. Hansen that she has very few

interpersonal relationships "other than her child and her husband" during the February 2019 consultative examination (R. 361); statements from her friend Marlin Toma's December 2018 Third-Party Function Report, which also describe Plaintiff's panic attacks and lack of desire to be around other people (R. 177, 182-84); and Dr. Jauren Kelly's finding at the August 2019 consultative examination that Plaintiff's symptoms include isolative behavior.  (R. 456); (Doc. 15, at 11).

But the ALJ discussed most of this evidence.  In particular, the ALJ expressly acknowledged: Plaintiff's statements regarding anxiety, panic attacks, and her desire to be alone from her June 2019 Function Report; Toma's statements echoing the same in her Third-Party Function Report; Plaintiff's reporting of "limited social contacts" to Dr. Hansen; and Dr. Jauren Kelly's noting of isolative behavior among Plaintiff's symptoms. (R. 19, 21-23).  The ALJ thus did not cherry-pick or overlook evidence, as Plaintiff contends, and instead reasonably considered the evidence related to Plaintiff's alleged social limitations, which consisted almost entirely of her own statements.  To the extent that Plaintiff contends that the ALJ erred by not discussing every one of her statements regarding her issues with being around others, the ALJ bore no duty to do so.  *Grove v. Kijakazi*, 2022 WL 1262131, at *2 (7th Cir. Apr. 28, 2022) (citing *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) & *Gedatus v. Saul*, 994 F.3d 893, 901 (7th Cir. 2021)) (cleaned up) ("ALJs do not have a duty to discuss every single piece of evidence and this is not a case where an ALJ ignored evidence contrary to h[er] conclusion."); *Rice*, 384 F.3d at 370 ("We have long held that an ALJ is not required to provide a complete written evaluation of every piece of testimony and evidence[.]") (internal quotations and citation omitted).

16

Moreover, the ALJ ultimately found that Plaintiff's (and Toma's) statements regarding her symptoms were "not entirely consistent" with the medical evidence (R. 21-22, 24), a finding Plaintiff does not contest. *See Underwood v. Saul*, 805 F. App'x 403, 406 (7th Cir. 2020) (arguments not raised before the district court are waived). The ALJ noted, for example, that mental status examinations between May 2019 and April 2020 generally showed normal mood and normal or pleasant affect. (R. 19, 21-22; *see, e.g.*, R. 460, 464-65, 469, 533, 550, 552). As discussed above, the ALJ also noted that Plaintiff denied having any mental complaints or psychiatric symptoms to Drs. George and Jeanette Kelly at multiple appointments between October 2018 and January 2020, which Plaintiff does not address. (R. 21-22 (citing R. 315, 381-82, 459, 463, 492, 498, 551)). In sum, Plaintiff has not demonstrated that the ALJ ignored evidence contrary to her conclusion that Plaintiff was only moderately limited in her ability to interact with others.

Similarly, in determining that Plaintiff has a moderate CPP limitation, the ALJ considered: (1) Plaintiff's statements in a December 5, 2018 Function Report regarding her difficulties with paying attention and following instructions (R. 19, 21, 274); and (2) Plaintiff's statements to Dr. Jauren Kelly at the August 2019 consultative examination that she had difficulty concentrating and tends to be "forgetful." (R. 19, 455). According to Plaintiff, the ALJ should have found her more limited because: (1) Toma stated in her Third-Party Function Report that Plaintiff "moves very slow," "can't focus for more than 10 minutes," "always [] needs rest," "cannot follow instruction," and has panic attacks and cries when stressed or faced with changes in routine (R. 178, 180, 182-83); (2) Plaintiff's cousin Dian Hanna stated in her Third-Party Function Report that Plaintiff "cannot finish any tasks and becomes anxious and cries" (R. 221); and Plaintiff stated in her June 2019

Function Report that she feels "fatigued, tired all the time," "cr[ies] all the time," and has issues with task completion. (R. 207, 212); (Doc. 15, at 12). Plaintiff also notes that she: (1) reported to Dr. Hansen at the February 2019 consultative examination that "at times she feels lost and cries at all times," she "worries constantly," and she "does very little" in terms of daily activities (R. 361); and (2) reported to Dr. Jauren Kelly at the August 2019 consultative examination that she "has flashbacks or intrusive thoughts of past war trauma a few times a week," she has crying episodes, and she last thought about suicide a week prior. (R. 455-57); (Doc. 15, at 12).

Plaintiff again relies primarily on her own complaints regarding her issues with CPP (or her friend's and her cousin's statements underscoring the same) in claiming that the ALJ should have found more-than-moderate limitations in CPP and, in turn, that she met a listing. This is insufficient. *Ann S.*, 2021 WL 354001, at *4 (claimant "cannot satisfy her burden at step three by simply cherry-picking favorable testimony and subjective symptom reports from the evidence of record and making blanket assertions that she satisfies [a listing]"); *Jeannie M. v. Kijakazi*, No. 19 C 2603, 2022 WL 488942, at *8 (N.D. Ill. Feb. 17, 2022) (no error where the ALJ addressed claimant's depression- and anxiety-related symptoms and concluded she had no more than mild mental limitations and claimant "d[id] no more than cherry-pick certain self-reported symptoms and make blanket assertions that she satisfie[d] the listings as a result"). Despite Plaintiff's claims to the contrary, the ALJ addressed Plaintiff's reported symptoms, including a thorough discussion of the symptoms she reported to Drs. Hansen and Jauren Kelly (R. 22-23), and simply did not assign the significance to them that Plaintiff would prefer in finding no more than a moderate limitation. As discussed above, the ALJ found Plaintiff's and

Toma's statements somewhat inconsistent with the medical evidence, and she concluded the same regarding Hanna's. (R. 24). Plaintiff does not contest this. The only other evidence she identifies in support of greater limitations is Dr. Hansen's observation that Plaintiff looked "tired" at the February 2019 consultative examination (Doc. 15, at 12 (citing R. 360)), which the ALJ also considered. (R. 22). As with the ALJ's determination regarding her ability to interact with others, Plaintiff fails to show that the ALJ ignored evidence contrary to her finding of a moderate limitation in CPP.

Finally, Plaintiff claims that the ALJ erroneously focused on her ability to perform certain activities in determining that she has only a mild limitation in adapting or managing herself. (Doc. 15, at 12-13). Plaintiff first contends that her ability to help get her son ready for school, wash dishes, groom herself, drive, and watch television does not support the ALJ's determination of only a mild limitation because she was "only able to do those limited activities on an occasional basis." (*Id.* at 13). Plaintiff's December 5, 2018 Function Report, in which she indicated that she could perform these activities, does contain varying statements regarding the extent to which she performs them. For example, when asked what she does from the time she wakes up until going to bed, Plaintiff stated that she "eat[s] something after cleaning dishes" (R. 270), but when asked about what type of housework she is able to do, Plaintiff responded, "I can't do anything in the house." (R. 271). Similarly, as for taking care of her son, Plaintiff stated that she "wake[s] up and help[s] [her] son get ready for school" and "give[s] him direction to help make sure he gets ready for school and completes homework" (R. 270), but when asked what types of things she was able to do before her conditions that she cannot do now, Plaintiff mentioned taking care of her son. (*Id.*).

Regardless of these apparent inconsistencies, Plaintiff contends that greater limitations were warranted because: (1) she reported having frequent flashbacks, frequent crying episodes, and suicidal thoughts (Doc. 15, at 12-13); and (2) at the August 2019 consultative examination, Plaintiff told Dr. Jauren Kelly that she does not know her address and "never goes anywhere alone." (*Id.* at 12 (citing R. 456)). Plaintiff disregards the fact that the ALJ discussed both of these points (R. 22-23) and simply did not find that they supported greater-than-mild limitations in this area. The Court finds no error on this basis.

For all of these reasons, the ALJ reasonably concluded that Plaintiff suffers from no more than moderate limitations in the paragraph B areas and Plaintiff fails to satisfy her burden of showing that her mental impairments meet or equal a listed impairment. "Substantial evidence is not a high hurdle to clear—it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bruno v. Saul*, 817 F. App'x 238, 241 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154). Here, the ALJ's listing analysis—specifically, her paragraph B assessment—satisfies this threshold and Plaintiff's request to remand the case for further consideration of this issue is denied.

### 2. Moderate CPP Limitation & The ALJ's RFC Determination

Plaintiff next argues that remand is warranted because the ALJ's RFC determination failed to adequately account for the moderate CPP limitations that she found at step three. (Doc. 15, at 13-14). A claimant's RFC is the maximum work that she can perform despite any limitations. 20 C.F.R. § 416.945(a)(1); SSR 96-8p. "[T]he responsibility for the RFC assessment belongs to the ALJ, not a physician, [but] an ALJ cannot construct his own RFC finding without a proper medical ground and must explain

how he has reached his conclusions." *Anna-Marie L. v. Kijakazi*, No. 21 C 50354, 2022 WL 4610120, at *2 (N.D. Ill. Sep. 30, 2022) (quoting *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012)). "Both the RFC assessment and the hypothetical question posed to the [VE] must include all of a claimant's limitations supported by the medical record," including "temperamental deficiencies and limitations in CPP." *Joshua J. H. v. Kijakazi*, No. 21 C 837, 2022 WL 2905673, at *2 (N.D. Ill. July 22, 2022) (quoting *Deborah M.*, 994 F.3d at 791); *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018); *Lanigan v. Berryhill*, 865 F.3d 558, 565 (7th Cir. 2017). "However, an ALJ may reasonably rely upon the opinion of a medical expert who translates these findings into an RFC determination." *Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019).

As discussed above, the ALJ determined that despite Plaintiff's moderate limitations in CPP, she was able to: understand, remember, and carry out simple, routine, and repetitive instructions; use judgment limited to simple work-related decisions; meet end-of-day goals but not fast, hourly production goals; tolerate occasional interaction with supervisors and coworkers but could not perform work involving tandem and coordinated tasks with coworkers; and could tolerate only brief and superficial interaction with the general public. (R. 20). Plaintiff argues generally in her opening brief that these restrictions are inadequate (Doc. 15, at 13-14), then clarifies in her reply brief that she believes the ALJ should have included a restriction for off-task time. (Doc. 22, at 10-11). This Court disagrees.

To begin, in her reply, Plaintiff bases her argument on the VE's testimony that "if off-task for more than 15% of the work-day (which amounts to anything more than 9 minutes out of an hour), an individual cannot sustain competitive employment." (*Id.* at

10).  Yet Plaintiff does not go so far as to say that she actually would need to be off task more than 15% of the workday.  Instead, she merely states that the ALJ erred by "failing to include anything in the RFC she crafted reflecting time-off task [*sic*]."  (*Id.* at 10-11).

Moreover, the only opinions regarding Plaintiff's mental functional capacity came from the state agency reviewing psychologists, neither of whom indicated that an off-task limitation was necessary.  (R. 62-66, 77-81).  As explained above, Dr. Burton found that Plaintiff would be at most moderately limited in "her ability to sustain the concentration, persistence and pace required for competitive work," and he concluded that she has "the capacity to engage in basic work activities."  (R. 65-66).  Dr. Voss agreed but added that Plaintiff "is capable of completing simple, routine tasks" and could "engage in simple work activities."  (R. 80-81).  The ALJ found those opinions generally consistent with the evidence of record, including the multiple instances in which Plaintiff's treaters found her to have a normal mood and affect on exam, and even imposed further restrictions such as end-of-day rather than fast, hourly production goals and repetitive (in addition to simple and routine) instructions.  (R. 23-24).  "This finding was more limiting than that of any state agency doctor or psychologist, illustrating reasoned consideration given to the evidence [Plaintiff] presented."  *Burmester*, 920 F.3d at 510; *see also Karla J.B. v. Saul*, No. 19 C 50019, 2020 WL 3050220, at *4 (N.D. Ill. June 8, 2020) ("Essentially, Plaintiff argues the ALJ erred by placing more—not fewer—restrictions on Plaintiff's RFC.  Again, this is a quizzical argument.").  Plaintiff does not contest the ALJ's analysis of these opinions in determining the RFC, and state agency psychological consultants are "highly qualified and experts in Social Security disability evaluation."  20 C.F.R. § 416.913a(b)(1); *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022) (same).  Indeed, Plaintiff does not

identify any physician of record, including any of her treating physicians, who determined that an off-task limitation was necessary or that Plaintiff's difficulties with CPP required any restrictions beyond those in the RFC. *Dudley v. Berryhill*, 773 F. App'x 838, 843 (7th Cir. 2019) ("When no doctor's opinion indicates greater limitations than those found by the ALJ, there is no error.") (citation omitted); *Dallas E.H. v. Kijakazi*, No. 20 C 2717, 2021 WL 4635802, at *4 (N.D. Ill. Oct. 7, 2021) (quoting *Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018)) (explaining that the absence of any "doctor's opinion relating to mental functioning more restrictive than the RFC" was "significant because the Seventh Circuit has established that 'there is no error when there is no doctor's opinion contained in the record that indicated greater limitations tha[n] those found by the ALJ'").

Absent any physician opinions in the record supporting an off-task limitation (or any other limitations beyond those in the RFC), Plaintiff purports to rely on medical evidence that she believes warrants such a limitation. In her reply brief, Plaintiff first suggests that an off-task limitation is necessary because "[t]he record substantiates that" she has frequent crying episodes, intrusive thoughts, and flashbacks to traumatic events, as well as suicidal thoughts. (Doc. 22, at 10 (citing R. 455)). But these symptoms are listed under the "History of Present Illness and Current Level of Functioning" portion of the mental status examination Plaintiff underwent with consultative psychologist Dr. Jauren Kelly. (R. 455). This "does not reflect an 'objective assessment or opinion' but 'the patient's subjective statements about the problem for which she is seeking care and a history of that problem, if any.'" *Kinnari A. v. Saul*, No. 19 C 760, 2020 WL 1863291, at *3 (N.D. Ill. Apr. 14, 2020) (quoting *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *9 (N.D. Ill. Feb. 29, 2016)). The other record Plaintiff cites is likewise a subjective

report from her friend Marlin Toma's Third-Party Function Report that "she has panic attacks and is always tired." (Doc. 22, at 10 (citing R. 177-78)).

Contrary to Plaintiff's suggestion, moreover, the ALJ did not ignore either record. In discussing Plaintiff's consultative examination with Dr. Jauren Kelly, the ALJ expressly acknowledged Plaintiff's reports of "regular flashbacks" of traumatic events, hearing "voices like a conversation," crying episodes, and feelings of hopelessness and suicidal thoughts. (R. 22-23). The ALJ also acknowledged both Plaintiff's and Toma's statements regarding Plaintiff's reported panic attacks, as well as Plaintiff's fatigue. (R. 19, 21). Ultimately, however, "an ALJ need only include limitations that are supported by the medical record," *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022), and there is no indication—either in the objective medical evidence or physician opinions—that the symptoms identified by Plaintiff resulted in specific work restrictions requiring time off task.

Viewing the record as a whole, the ALJ did not err in relying on the state agency psychologists' uncontradicted RFC assessments and imposing even further restrictions in the RFC to account for Plaintiff's moderate limitations in CPP. *See, e.g.*, *Amy V. v. Kijakazi*, No. 22 C 00009, 2022 WL 17082527, at *10 (N.D. Ill. Nov. 18, 2022) (quoting *Gedatus*, 994 F.3d at 904) (no reversible error where the ALJ "assessed *more* limits than any doctor did"). Plaintiff's request to remand the case for further consideration of this issue is denied.

### 3. Exertional Impairments

Plaintiff argues that the case still requires reversal or remand because the ALJ erred in concluding that she has no exertional limitations from her physical impairments.

More specifically, Plaintiff appears to contend that the ALJ erred in finding that she has no severe physical impairments at step two, and this failing snowballed into an RFC that did not account for any exertional limitations.  (Doc. 15, at 14-15; Doc. 22, at 11-13).[7] This Court disagrees.

At step two, the ALJ found that Plaintiff has multiple physical impairments that are non-severe, meaning that "they have no more than a minimal effect on [Plaintiff's] ability to perform basic work activities or they have not persisted for a continuous period of at least 12 months."  (R. 18).  These include: gastroesophageal reflux disease, a history of iron deficiency anemia and Vitamin B12 and D insufficiency, pre-diabetes, elevated triglycerides, mild conductive hearing loss, degenerative disc disease of the lumbar spine, right hip degenerative joint disease, and obesity.  (*Id.*).  The ALJ considered these non-severe physical impairments along with Plaintiff's severe mental impairments in assessing the RFC and determined that she was capable of performing a full range of work at all exertional levels with some non-exertional limitations.  (R. 18-20).

As an initial matter, to the extent Plaintiff is arguing that the ALJ made an error at step two by not finding any of Plaintiff's physical impairments to be severe, any such error was harmless.  As Plaintiff acknowledges, "[t]he Step 2 determination is 'a *de minimis* screening for groundless claims' intended to exclude slight abnormalities that only

---

[7]    In her opening brief, Plaintiff states that "[t]he ALJ apparently found that [she] has no severe physical impairments because she declined to have right hip injections, because she got some relief from physical therapy, and because there were some normal examination findings."  (Doc. 15, at 14 (citing R. 18)).  To the extent that Plaintiff intended to suggest that the ALJ's reliance on these grounds in finding her physical impairments to be non-severe was flawed, this sentence alone is insufficient.  Plaintiff does not identify why the ALJ's reliance on these grounds was faulty, and her reply does not mention this point at all.  Thus, any such argument is waived.  *Krell v. Saul*, 931 F.3d 582, 586 n.1 (7th Cir. 2019) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.") (citation omitted); *Horr v. Berryhill*, 743 F. App'x 16, 20 (7th Cir. 2018) (same).  Regardless, the Court finds that any such argument would not provide a basis for remand for the reasons discussed below.

minimally impact a claimant's basic activities." *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016) (quoting *Thomas v. Colvin*, 826 F.3d 953, 960 (7th Cir. 2016)); (Doc. 22, at 11-12). "[A]s long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process," making any error of omission at step two harmless. *Esther V. v. Saul*, No. 19 C 8093, 2021 WL 1121123, at *4 (N.D. Ill. Mar. 24, 2c021) (quoting *Castile*, 617 F.3d at 926-27); *see also Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) ("[E]ven if there were a mistake at Step 2, it does not matter. Deciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even *one* severe impairment.") (citation omitted). As discussed above, the ALJ found that Plaintiff's depression, anxiety, and PTSD are severe and so proceeded through the next sequential steps. (R. 18-24). In such circumstances, any error the ALJ may have made at step two was at most harmless and does not support remanding the case.

Beyond this, the Court finds that substantial evidence supports the ALJ's finding of non-severe physical impairments, as well as the ALJ's determination that no exertional limitations were warranted in the RFC. In reaching these conclusions, the ALJ considered the opinion evidence of record related to Plaintiff's physical functional capacity, which consisted of RFC assessments from two state agency reviewing medical consultants. (R. 23). On March 12, 2019, Calixto Aquino, M.D. determined that Plaintiff's physical impairments were non-severe. (R. 61-62). Ranga Reddy, M.D. affirmed this assessment on August 29, 2019. (R. 76). The ALJ found these opinions to be "persuasive" as they were consistent with the evidence of record, including generally normal physical

examinations showing normal strength and tone, normal gait, and no neurological deficits. (R. 23 (citing R. 460, 464-65, 469, 492, 496, 499, 508, 532-33, 550, 729)). The ALJ also found that the state agency medical consultants' determination of non-severe physical impairments was consistent with the February 27, 2019 consultative examination findings of Scott P. Smith, M.D., M.P.H., F.A.C.P. (R. 23). These findings included: normal gait; ability to walk 50 feet without assistance; negative straight leg raise; negative cerebellar testing; 5/5 hand grip bilaterally; 5/5 motor strength; normal range of motion in the cervical spine, shoulders, elbows, wrists, hips, knees, and ankles; normal strength, sensation, and deep tendon reflexes; and intact cranial nerves. (R. 366-74).

Similar to her mental impairments, Plaintiff challenges the ALJ's reliance on the state agency consultants' opinions in concluding that she has no severe physical impairments because the ALJ did not refer to the opinions in her step-two analysis. (Doc. 22, at 11). But the ALJ expressly stated that she found the agency consultants' determination of non-severe physical impairments to be "persuasive" when assessing the RFC, and the Court reads the ALJ's decision as a whole. *Lisa S.*, 2020 WL 5297028, at *7 (quoting *Rice*, 384 F.3d at 370) (no error where the ALJ considered agency experts' reports at a different point in her analysis because "it is proper to read the ALJ's decision as a whole' instead of in discrete parts"); *Laura P. v. Comm'r of Soc. Sec.*, No. 22 C 7188, 2023 WL 5227413, at *3 (N.D. Ill. Aug. 15, 2023) (agreeing that "evidence discussed in one part of a decision reasonably supports conclusions in other parts of the decision").

Moreover, Plaintiff fails to identify any physician opinion in the record contradicting the state agency consultants' determination of no severe physical impairments or otherwise demonstrating that she requires accommodations for her physical impairments.

27

Plaintiff instead points to a number of medical records she believes show that her physical impairments cause "more than slight impact on [her] functional capacity." (Doc. 15, at 14-15; Doc. 22, at 12). These include: a January 24, 2018 appointment with Dr. George, in which he documented back tenderness with range of motion and assessed chronic back pain with radiculopathy (R. 327); a January 27, 2018 MRI of the lumbar spine showing moderate bilateral facet arthropathy with mild foraminal stenosis at L4-L5 (R. 296); Dr. Smith's findings of moderate difficulty squatting and mild difficulty getting on and off the exam table, as well as decreased range of motion for flexion and extension in the lumbar spine at the February 27, 2019 consultative examination (R. 367, 372); May 9, 2019 x-rays of the right hip showing "mild degenerative changes, without acute osseous abnormality" but with "findings concerning for right femoroacetabular impingement" (R. 418); a May 28, 2019 pelvic x-ray showing small bilateral acetabular spurring (R. 471); a physical examination conducted by Dr. Jeannette Kelly on July 30, 2019 showing tenderness to the right hip at the greater trochanter and piriformis, as well as positive FADIR and FABER tests, and diagnoses of right hip pain, piriformis syndrome, and greater trochanteric bursitis (R. 460); Dr. Jeannette Kelly's September 3, 2019 assessments of multifactorial right hip pain, improved SI joint pain, greater trochanteric bursitis (improved but still with tenderness to palpation), and symptoms consistent with interarticular hip pain (R. 464); October 8, 2019 physical therapy records noting that Plaintiff still had a "small strength deficit in her hip abduction" and continued to have trigger point pain in the right piriformis and deep hip pain that was unable to be "fully eliminate[d]" at the time (R. 631); and Dr. Jeannette Kelly's February 18, 2020 assessments of worsening right hip pain, right SI joint pain, greater trochanteric bursitis,

right piriformis syndrome, and segmental and somatic dysfunction at the pelvic, sacrum, lumbar, and lower extremity levels. (R. 465). Plaintiff also notes that "[p]hysical therapy records showed continued pain ranging from 5-8/10 and increased with standing." (Doc. 15, at 15; Doc. 22, at 12).

But Plaintiff fails to explain how any of these records demonstrate that her physical impairments impose particular restrictions on her ability to work. Simply identifying the records, listing some findings and diagnoses from the records, and stating in conclusory fashion that they cause "more than [a] slight impact on [her] functional capacity" (Doc. 15, at 14-15) is not sufficient. *See Dragan K. v. Saul*, No. 19 C 3283, 2020 WL 4015326, at *2 (N.D. Ill. July 16, 2020) ("[T]he Seventh Circuit has consistently reiterated that a disability claimant must establish specific limitations affecting his/her ability to work."); *Weaver v. Berryhill*, 746 F. App'x 574, 578-79 (7th Cir. 2018) ("having been diagnosed with these impairments does not mean they imposed particular restrictions on [claimant's] ability to work. . . . It was [claimant's] burden to establish not just the existence of the conditions, but to provide evidence that they support specific limitations affecting her capacity to work."); *Best*, 730 F. App'x at 382 (rejecting argument that the ALJ erred in formulating the RFC by not including any limitations based on claimant's neck problems where claimant "point[ed] to his diagnosis of radiculopathy, but no doctor recommended any limitations based on this condition"). Furthermore, Plaintiff does not specify whether she believes that all of her physical impairments warrant further limitations to the RFC or only some, as she states that "the evidence cited above may not show a *hip impairment* that existed at Listings level, [but] it more than adequately substantiates an impairment that has more than a slight impact on [her] ability to work." (Doc. 22, at 13) (emphasis

added).  Nor does Plaintiff specify what type(s) of exertional limitations would have better accommodated those impairments.  (*Id.*).

Moreover, Plaintiff disregards the fact that the majority of the records that she identifies in support of exertional limitations were available to the state agency medical consultants when they issued their opinions, and they still found her physical impairments to be non-severe.  (R. 61-62, 76).[8]  Plaintiff's "fundamental problem," however, is that she has offered no opinion from any doctor setting exertional limits based on her physical impairments, *Gedatus*, 994 F.3d at 904, and instead asks this Court to reweigh the evidence in her favor.  *See also Rice*, 384 F.3d at 370 ("More importantly, there is no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ."); *Hosea M. v. Saul*, No. 18 C 2926, 2019 WL 5682835, at *7 (N.D. Ill. Nov. 1, 2019) (quoting *Best*, 730 F. App'x at 382) ("[C]ourts within this Circuit have repeatedly held that 'there is no error' in the formulation of an RFC 'when there is no doctor's opinion contained in the record that indicates greater limitations than those found by the ALJ.'"); *Cynthia Q. v. O'Malley*, No. 22 C 50401, 2024 WL 383671, at *5 (N.D. Ill. Feb. 1, 2024) (finding "critical" claimant's failure to offer "any opinion from a physician recommending RFC limitations greater than those found by the ALJ" given Seventh Circuit guidance that there is no error under such circumstances).

---

[8]      Unlike with her mental impairments, Plaintiff does not argue that the ALJ's reliance on the agency consultants' opinions regarding her physical impairments was improper because certain records post-date the opinions.  Such an argument has been waived.  *Underwood*, 805 F. App'x at 406.  However, even if Plaintiff had not waived the argument, it is without merit, as Plaintiff has not shown that any subsequent records contained new, significant diagnoses that changed the picture so much that the ALJ erred by relying on the state agency consultants' opinions.

For these reasons, substantial evidence supports the ALJ's conclusion that Plaintiff's physical impairments are non-severe and do not warrant exertional limitations within the RFC.

## **CONCLUSION**

For reasons stated above, Plaintiff's request to reverse or remand the case is denied and the Commissioner's Motion for Summary Judgment [20] is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated: March 13, 2024

SHEILA FINNEGAN
United States Magistrate Judge

31